FRANK STAMATO, PLAINTIFF-APPELLANT, v. FRED AGAMIE, DEFENDANT-RESPONDENT.

Argued March 11 and March 18, 1957—Decided May 13, 1957.

Mr. *Aaron Heller* argued the cause for plaintiff-appellant (*Messrs. Heller & Laiks,* attorneys; Mr. *Aaron Heller,* of counsel).

Mr. *Howard Stern* argued the cause for defendant-respondent (*Messrs. Boyle & Boyle,* attorneys; Mr. *Howard Stern,* of counsel).

The opinion of the court was delivered by

WEINTRAUB, J. Plaintiff, Frank Stamato, prevailed in a suit for specific performance of a contract for the sale of land owned by defendant, Fred Agamie. The Appellate Division reversed and we granted certification. 23 *N. J.* 115 (1956).

On August 14, 1953, the parties executed the following memorandum:

"This agreement between Frank Stamato and Fred Agamie of 18 South Jefferson St., Orange, N. J. Frank Stamato of 1 Pearl Brook Drive, Clifton, N. J., agree to buy Tract of Land located on the West side of River View Drive consisting of app. 12 acres including 1 family 6 room House and South of Totowa-Wayne Airport Also Tract of Land consisting of App. 8 acres East of River View Drive and South of Totowa-Wayne Airport subject to Frank Stamato acquiring app. 2 acres of land running North-South through the 12 acres on the Westerly side of River View Dr. also subject to change of Zone from Residence to Light Industry. The Purchase Price will be ($22,500.) Twenty Two thousand Five Hundred Dollars. Deposit will be ($500.) Five Hundred Dollars. Upon signing of Contract ($2,000.) Two thousand Dollars. Balance at Closing within 90 days to 180 days.

                                FRED AGAMIE
                                FRANK STAMATO
JACOB T. BRAIN"

The deposit of $500 was paid at the time of the execution of the memorandum.

It will be noted that the parties contemplated a further payment of $2,000 to be made "Upon signing of Contract" and that plaintiff's obligation to perform was contingent upon (a) his acquisition of a two-acre tract owned by a third party and (b) the rezoning of the lands here involved from residential to light industrial.

The memorandum was prepared without the aid of counsel. Plaintiff immediately engaged an attorney, Albert H. Kreamer. Kreamer promptly prepared a formal contract which he·sent to plaintiff for execution, but plaintiff did not sign it and did not post the required sum of $2,000. Kreamer's effort to obtain a change of the zoning ordinance

failed when the planning board reported adversely on October 5, 1953, and although he prepared an ordinance in December 1953, it was never presented. We are told that plaintiff took some steps toward acquiring the two-acre parcel, without success, but the record does not reveal any detail.

On March 16, 1954, one month after the expiration of the outside date fixed in the memorandum for closing, defendant, through his attorney, Boyle, wrote to Kreamer inquiring "if your client desires the return of his deposit." The letter went unanswered. On May 14, 1954 Boyle sent Kreamer a check for $500 endorsed to the latter's order as attorney for plaintiff, describing the sum as having been received "for an option" on the lands. By letter of May 17, 1954 Kreamer replied, saying that he had written to plaintiff, in care of Jacob T. Brain (the intermediary who brought the parties together and who had some connection with plaintiff, not clearly disclosed in the record), "but heard nothing from him in response to my letter"; that he telephoned Brain for a decision; that at about the time of the receipt of the letter of May 14, "I received word from Mr. Brain and Mr. Stamato was still interested in purchasing the property." He added that he was uncertain as to whether his client "can still insist upon the terms of the contract being carried out"; that "rather than having a check lie around loose in my office I am depositing the check that was made out to me as attorney in the firm's special trustee account" and concluded, "I am writing this date to Mr. Stamato to advise him as to the receipt of the check and will let you know later as to what his thoughts are in this matter."

On June 15, 1954 Boyle wrote Kreamer, making specific reference to the latter's letter of May 17 and inquiring whether plaintiff "intends to purchase the property." On June 17, 1954 Kreamer replied saying:

"Mr. Brain telephoned to me shortly after my letter [of May 17] to him, advising me that he understood Mr. Stamato was still interested in the purchase of the property, that he would get in touch

with Mr. Stamato and have Mr. Stamato advise me directly. However, I have heard nothing since that telephone conversation."

and concluding,

"This is rather a lengthy letter to give you a simple answer to the effect that I still have not any knowledge as to what Mr. Stamato intends to do but I will write Mr. Brain again at once and tell him that we must know immediately. It may be better for your client to go along with Mr. Stamato and sell the property to him or it may be better for him to renounce the contract, but, of course, that decision will be left to you and your client."

That was the last defendant heard until present counsel for plaintiff dispatched a registered letter dated March 10, 1955, wherein it was stated that plaintiff "intends to take title under the contract and is presently having the property searched" and "We are notifying you by Registered Mail so that you may understand that the contract is in full force." Thus, 19 months after the memorandum was executed plaintiff for the first time expressed his purpose to complete the transaction, and one month later filed a complaint in which he waived the conditions with respect to the zoning change and the acquisition of the two acres.

The testimony of Kreamer and Brain show conclusively that although plaintiff learned promptly of the return of the deposit in May 1954, he did not direct Kreamer to return it and, of course, never posted the further sum of $2,000.

Following the mentioned correspondence, defendant engaged a broker. Others expressed an interest in the property. In October 1954 defendant obtained an appraisal to the effect the property was worth $16,000 as then zoned, and about $60,000 if rezoned for light industrial. The property was so rezoned two months after this suit was instituted. Plaintiff did not testify as to what renewed his interest in the property.

The trial court concluded there was not made out "a case of laches on the part of the plaintiff. Neither party took any steps. The matter was left in a vacuum."

■ The Appellate Division expressed doubt that the memorandum satisfied the statute of frauds (*R. S.* 25:1–5) for want of an express promise to sell, but placed its result on other grounds. In passing we note our view that the memorandum meets the statute. *Wollenburg v. Rynar,* 96 *N. J. Eq.* 38 (*Ch.* 1924); *Franklin v. Welt,* 98 *N. J. Eq.* 602 (*Ch.* 1926); *Monahan v. McElligott,* 136 *N. J. Eq.* 306 (*Ch.* 1944), affirmed 137 *N. J. Eq.* 176 (*E. & A.* 1945).

The Appellate Division based its conclusion upon two holdings: (a) that the parties did not intend to be bound until a formal contract was signed, and (b) plaintiff's conduct was not such as to entitle him to specific performance.

■ Plaintiff emphasizes that the memorandum contains all of the terms of the deal and relies upon *Burlew v. Hepps,* 6 *N. J. Super.* 16 (*App. Div.* 1949), to support his position that the parties were committed at once, notwithstanding the provision for a further deposit upon the execution of a formal contract. Defendant stresses *Hobelman v. Cavallo,* 102 *N. J. Eq.* 243 (*E. & A.* 1928). The issue is one of fact and hence there is no imperative recipe. Here the payment made at the time the memorandum was signed was quite nominal and hence much weight could be given to the provision for the further deposit of $2,000 associated in the memorandum with the execution of a formal contract, in concluding that the parties did not intend to be bound until the conjoined events occurred. We are not disposed to differ with the Appellate Division in its finding of fact.

■ We fully agree with the Appellate Division that plaintiff is not entitled to prevail even if the memorandum were found to constitute an agreement. Equity deems time provisions in a land contract to be formal rather than essential, unless the circumstances or express language indicate otherwise. Equity does not thereby seek to remake a contract but rather to give effect to the intention of the parties. Accordingly, equity will enforce an express provision making time of the essence, and where the contract is not thus explicit, it will deem the parties bound by a subsequent reasonable notice making time of the essence. *Brinn v.*

*Mennen Co.*, 4 *N. J.* 610 (1950); *Doctorman v. Schroeder*, 92 *N. J. Eq.* 676 (*E. & A.* 1921); *Orange Society of New Jerusalem v. Konski*, 94 *N. J. Eq.* 632 (*Ch.* 1923), affirmed 95 *N. J. Eq.* 254 (*E. & A.* 1923); *Korb v. Spray Beach Hotel Co.*, 24 *N. J. Super.* 151 (*App. Div.* 1952). But a party may not ignore the provisions of his agreement to suit his own convenience or profit.

There is no precise formula for determining when equity will grant specific performance to one who fails to meet the time provisions of his contract. The ultimate objective is a just solution upon all of the circumstances. The equitable doctrine was not designed to permit a party to dally or speculate upon price movements. Rather "the general rule is that he who seeks performance of a contract for the conveyance of land must show himself ready, desirous, prompt, and eager to perform the contract on his part." *Meidling v. Trefz*, 48 *N. J. Eq.* 638 (*E. & A.* 1891); *Kobrin v. Drazin*, 97 *N. J. Eq.* 400 (*Ch.* 1925); *Barry v. Ruskin*, 99 *N. J. Eq.* 730 (*Ch.* 1926), affirmed 100 *N. J. Eq.* 557 (*E. & A.* 1927); *Korb v. Spray Beach Hotel Co.*, *supra* (24 *N. J. Super.* 151). And where the obligation in the contract is essentially unilateral, as here, in the sense that plaintiff had an escape if the property should not be rezoned or if he should fail to acquire the acreage of the third person, delay is viewed with special strictness. *Meidling v. Trefz*, *supra* (48 *N. J. Eq.*, at *page* 643); *Moran v. Fifteenth Ward B. & L. Assn.*, 131 *N. J. Eq.* 361, 363 (*Ch.* 1942); *Fry, Specific Performance* (*6th ed.* 1921), § 1103, *p.* 515; *Pomeroy, Specific Performance* (*3d ed.* 1926), § 387–8, *p.* 821. It would be unreasonable to find that the party who alone is fully committed agreed to be bound interminably, and hence in these circumstances the agreed time limitations are more meaningful than in situations in which the obligations are bilaterally firm. Especially is this true when there is absent any element of forfeiture of a partial performance. *Cf.* 3 *Corbin, Contracts* (1951), § 714, *p.* 800.

Here plaintiff disregarded his agreed obligation. He did not sign the formal contract his attorney sent to him. He

did not post the additional sum of $2,000. He did nothing to accomplish a change in zone after the disapproval of the planning board in October 1953. How diligent he was in seeking the two-acre tract does not appear. He knew in May 1954 that defendant had returned the $500 deposit, but he permitted it to remain with his attorney. He wholly ignored requests for a statement of his intentions. It was not until 19 months after the contract and 13 months after the agreed terminal date for closing that he evidenced any interest, and then for the first time ordered a title search and elected to waive the escape provisions. He offered no excuse or justification for his failure to meet the contract. Manifestly, he did not perform the agreement he would now enforce. Rather he sought to play the game cagily, without a penny on the line.

Plaintiff urges that if specific performance is barred, yet he is entitled to damages for breach of contract. His thesis seems to be that upon the making of the contract he acquired a right to relief at law until barred by the statute of limitations, notwithstanding his own disregard of the contract.

At law, time provisions in land contracts were historically deemed to be of the essence unless a contrary intention appeared. *Earlin v. Mors,* 1 *N. J.* 336 (1949); *Hodes v. Dunsky,* 5 *N. J. Super.* 333 (*App. Div.* 1949); *Fry, Specific Performance* (*6th ed.* 1921), § 1072, *p.* 500; *Pomeroy, Specific Performance* (*3d ed.* 1926), § 371, *p.* 793; 3 *American Law of Property* (1952), § 11.45, *p.* 118. The common law rule in England has been changed by statute to bring it in harmony with the equitable view, *Fry, op. cit., supra,* § 1073, *p.* 501, and it has been suggested to be probable that "the absorption of equitable principles by the law has modified the severity of this rule even without the aid of statute." 3 *Williston, Contracts* (1936), § 847, *p.* 2376. Professor Corbin questions the accuracy of the usual statement of the common law principle. 3 *Corbin, Contracts* (1951), § 713, *p.* 795. See *Restatement of Contracts* (1932), § 276. Whatever should be the rule of

law, a right to damages cannot exist when plaintiff's conduct is such as to foreclose relief under the liberal approach of equity.

██ Defendant's right to rescind cannot be questioned. And the record compels as well an objective finding that plaintiff acquiesced in the recission and abandoned the contract.

The judgment of the Appellate Division is accordingly affirmed.

*For affirmance*—Chief Justice VANDERBILT, and Justices HEHER, BURLING, JACOBS and WEINTRAUB—5.

*For reversal*—None.