**NOT FOR PUBLICATION WITHOUT THE
APPROVAL OF THE APPELLATE DIVISION**

This opinion shall not "constitute precedent or be binding upon any court." Although it is posted on the internet, this opinion is binding only on the parties in the case and its use in other cases is limited. R. 1:36-3.

SUPERIOR COURT OF NEW JERSEY
APPELLATE DIVISION
DOCKET NO. A-2010-23

3305 PALISADES AVE., LLC,
ESSEQUIBIO, LLC, and
SELWYN R. WINTER,

      Plaintiffs-Appellants,

v.

ALFARO ENTERPRISES, LLC,

      Defendant-Respondent.

Submitted March 19, 2025 – Decided May 20, 2025

Before Judges Currier and Marczyk.

On appeal from the Superior Court of New Jersey, Chancery Division, Hudson County, Docket No. C-000137-23.

McHugh and Brancato, LLP, attorneys for appellants (Mark J. Brancato, on the brief).

Mattleman, Weinroth & Miller, PC, attorneys for respondent (Jeffrey A. Malatesta, on the brief).

PER CURIAM

The parties executed a land sale contract (contract) for the purchase of property in Union City. The contract included a mortgage-loan-contingency clause that required plaintiffs to acquire financing for the purchase of the property and made the contract voidable by either party if plaintiffs failed to acquire the financing. After the parties could not agree on the terms of the financing, defendant terminated the contract.

Plaintiffs filed this action seeking specific performance; defendant moved for summary judgment. The court granted the motion, finding the mortgage-loan-contingency clause permitted defendant to validly cancel the contract after plaintiffs did not accept the financing terms of the loan. We affirm.

The parties signed the contract for the purchase of a multifamily dwelling in April 2023. The contract included the following terms: plaintiffs would purchase the property for a total purchase price of $850,000; plaintiffs would pay $200,000 at closing; and a $650,000 mortgage, memorialized in writing, was required for the remainder of the purchase price. If plaintiffs did not obtain a mortgage, either party had the power to cancel the contract, specifically: "[I]f [b]uyer has not obtained the commitment, then either [b]uyer or [s]eller may void this [c]ontract by written notice to the other party and [b]roker(s) within ten (10) calendar days . . . ."

Plaintiffs proposed a rider to the contract which included several changes to the terms. Specifically, under paragraph twenty-nine, they requested it be changed to "[t]he loan . . . will be provided by . . . [defendant]. The interest rate shall be 3% and the loan will be amortized over 30 years. . . . [Defendant's] attorney shall prepare the note and mortgage."

On May 3, 2023, defendant advised the contract and proposed rider would be acceptable if several revisions were made, which included the following:

> Closing shall be on or before June 1, 2023.
>
> . . . .
>
> Fill in [fee] $500[.]
>
> . . . .
>
> Paragraph 13: Not Acceptable.[1]
>
> . . . .
>
> . . . The loan in the amount of $650,000 will be provided by the [s]eller . . . [t]he interest rate shall be 4% and the loan will be amortized over 30 years. The loan will balloon after 5 years. The monthly payment of the principal [and] interest shall be $3,103.20 . . . . The Seller's attorney shall prepare the [n]ote and [m]ortgage.

---

[1] Paragraph thirteen was a Risk of Loss clause.

On May 9, defendant conveyed to plaintiffs the following proposed terms: "$850,000 sales price, $200,000 down payment [with] 3.5% [interest] the first year, 3.75% year [two] and [three], [and] 4% year [four] and [five]." Additionally, defendant stated, "[w]ith this reduction in interest, my client has made it clear that the building is being sold 'as is' and no further concessions will be made."  Later that day, plaintiffs replied, "[t]he financing terms in your May 9th email are acceptable to my client."

However, on May 10, plaintiffs replied to the May 3, 2023 correspondence regarding defendant's changes to the rider, accepting the terms except for the following changes:  a closing date before June 15, 2023; adjustment of the proposed fill in fee from $500 to $750; rejection of a change to paragraph thirteen regarding risk of loss; and the addition of a new "paragraph [thirty-one]" in which "[s]eller agrees to clear the basement of all rubbish prior-to-closing."

On June 8, 2023, the parties agreed upon a closing date of June 30, 2023. It was later extended.

On June 20, defendant informed plaintiffs it had hired a third-party mortgage drafter to prepare the commercial mortgage and security agreement. Defendant advised the drafter's fee was $2,000 and plaintiffs were responsible for the charge since "it [wa]s their responsibility to secure a mortgage to

4

purchase the property." Plaintiffs objected, stating they would pay only $1,000 of the fee, because the contract stated that defendant's attorney would prepare the note and mortgage.

The mortgage agreement prepared for the June 30 closing contained the agreed-upon interest rates for the loan. The note also included a term requiring "an escrow for the prepayment of interest in the amount of $10,000.00 which will be disbursed at closing."

Plaintiffs objected, and on July 17, 2023, provided a list of requested changes to the note and mortgage payments:

As to the Note

l. Dates to be changed to a closing date in July.

2. The first payment should be 30 days after closing, not the day after closing.

3. Section 8(b) amend fifteen (15) to thirty (30).

4. Section 8(c) amend fifteen (15) to thirty (30).

5. Section 9- amend to "at a rate of ten (10%) percent." Remove "equal to the lesser of i[]" and "or ii[] the highest rate permissible by law per annum."

As to the mortgage

1. Dates to be modified.

 A-2010-23

2. 7.a. delete (v) pay an escrow for the payment of interest in the amount of $10,000.00 which will be disbursed at closing."

3. 7b amend "ten (10) days to thirty (30) days."

4. Delete 4(h)

5. Delete 4(i)

6. 13(a) amend "five (5) days" to "thirty (30) days."

7. 13(b) amend "five (5) days" to "thirty (30) days."

8. I do not understand #22. Can you call me and explain.

On July 21, defendant advised that after reviewing the requested changes, "it [did]n't appear that [they could] come to an agreement," and that if plaintiffs wished to "proceed with the purchase," they could "reasonably extend the closing date to allow [plaintiffs] to secure alternate funding . . . [or] [a]lternatively, [they could] . . . voluntarily terminate the contract."

On July 26, plaintiffs advised they agreed to the terms of the loan documents except for the $10,000 escrow payment, as the term was not in the original contract or addendums.

Defendant responded on July 28, stating it was cancelling the contract and that plaintiffs' rejection of the terms of the mortgage had already terminated the

contract when they "proposed a completely different mortgage document." Plaintiffs replied "[a]t this time [we] reject the termination letter." On July 31, plaintiffs stated they would agree to the $10,000 escrow payment.

Thereafter, plaintiffs filed a verified complaint and order to show cause seeking specific performance of the contract and to compel closing. Defendant moved for summary judgment.

After hearing oral arguments, the court granted the motion in an oral decision on February 2, 2024. The court reasoned:

> [T]he contract itself, made [full] acceptance of the mortgage, a condition . . . [s]o . . . in my view, this never came out of attorney review. . . . Despite what was written in the . . . correspondence . . . .
>
> The negotiations continued, first on . . . who should prepare the [mortgage] document.
>
> . . . [Which defendant] subcontract[ed] . . . out . . . [the cost of which was] $2000.
>
> That became a big point of contention. Apparently at some point, the parties agreed to split [the cost]. Then there was this $10,000 . . . escrow issue, which, according to [plaintiffs' counsel], was resolved, and his client acceded to it. But only after the termination letter went out.
>
> So[,] I am granting the motion. I believe that this contract . . . to repeat myself again, never really came out of attorney review. The material terms of the mortgage[] were still being negotiated.

7

> . . . [I]t appeared the parties reached an impasse[]
> . . . defendant said, you know what? We're done. And
> then the response to that was, no, no, no, no, no. That's
> okay . . . we'll agree.
>
> That's not how it works. . . . [I]n the view of this
> [c]ourt, it was too late. So I'm granting the motion in
> its entirety.

The court also stated it did not see specific citations to material disputed facts.

On appeal, plaintiffs contend: the court erred in stating there were no specific citations to disputed material facts and that there was no contract because the contract never came out of attorney review; and there were disputed issues of facts that precluded the grant of summary judgment.

Our review of the trial court's grant or denial of a motion for summary judgment is de novo, applying the same standard used by the trial court. Samolyk v. Berthe, 251 N.J. 73, 78 (2022). We consider "whether the competent evidential materials presented, when viewed in the light most favorable to the non-moving party, are sufficient to permit a rational factfinder to resolve the alleged disputed issue in favor of the non-moving party." Brill v. Guardian Life Ins. Co. of Am., 142 N.J. 520, 540 (1995); R. 4:46-2(c).

We can quickly dispose of plaintiffs' argument that the court did not consider its submissions. A review of the transcript reveals the court's comment about the lack of citations to disputed facts followed a discussion about requests

8

for admissions. During the decision, the court referenced the papers and demonstrated knowledge of the arguments contained in the submissions. And through its questioning, it is clear the court was well versed in the facts of the case, the relevant documents, and the parties' positions on the issues.

The comment about the attorney review process was also innocuous. The court noted several times that the issue before it was whether defendant was entitled to terminate the contract under the presented circumstances. Moreover, even if the attorney review was completed, it had no bearing on defendant's ability to cancel the contract under its terms.

We turn then to a consideration of the contract. Our review is guided by "familiar rules of contract interpretation." Barila v. Bd. of Educ. of Cliffside Park, 241 N.J. 595, 615 (2020) (quoting Serico v. Rothberg, 234 N.J. 168, 178 (2018)). The starting point is the plain language of the contract, id. at 616, construed "given its ordinary, reasonable meaning absent" a showing that "it was used in a different sense." McKenna v. Rosen, 239 N.J. Super. 191, 196 (App. Div. 1990) (citing Friedman v. Tappan Dev. Corp., 22 N.J. 523, 530-531 (1956)).

Further, courts "enforce contracts 'based on the intent of the parties, the express terms of the contract, surrounding circumstances[,] and the underlying

purpose of the contract.'" Manahawkin Convalescent v. O'Neill, 217 N.J. 99, 118 (2014) (quoting Caruso v. Ravenswood Devs., Inc., 337 N.J. Super. 499, 506 (App. Div. 2001)). "[W]hen the intent of the parties is plain[,] and the language is clear and unambiguous, a court must enforce the agreement as written, unless doing so would lead to an absurd result." Quinn v. Quinn, 225 N.J. 34, 45 (2016). As such, courts will not "make a better contract for either party." Graziano v. Grant, 326 N.J. Super. 328, 342 (App. Div. 1999).

As the court found, the parties agreed there was a valid contract. The dispute arose regarding the following contract condition: "[I]f [b]uyer has not obtained the [mortgage] commitment, then either [b]uyer or [s]eller may void this [c]ontract by written notice to the other party and [b]roker(s) within ten (10) calendar days . . . ."

A mortgage-loan-contingency clause included in a land sales contract is valid if the clause is "clear and unmistakable," and "the loan commitment [does not contain] conditions beyond the[] sole ability [of the buyer] to satisfy." Farrell v. Janik, 225 N.J. Super. 282, 287 (Law. Div. 1988). Further, the clause "certainly requires [that] the purchasers . . . use their best efforts to comply with any and all conditions imposed by the lending institution as a pre-condition for

obtaining the loan." McKenna, 239 N.J. Super. at 195 (citing Farrell, 225 N.J. Super at. 287).

Here, the language in the mortgage continency clause, given its plain meaning, unambiguously establishes a condition precedent for plaintiffs to acquire financing before closing. This condition does not impose responsibilities placed on plaintiffs that are beyond their control, as the clause itself as well as the larger record reveal plaintiffs were free to "use their best efforts to comply with" it by acquiring financing on their own if defendant's proffered financing was not acceptable. Ibid. Plaintiffs took no action "to perform the contract on [their] part" by seeking outside financing but rather rejected and proposed a new mortgage agreement. Stamato v. Agamie, 24 N.J. 309, 316 (1957) (quoting Meidling v. Trefz, 48 N.J. Eq. 638, 644 (1981)). Defendant was entitled to terminate the contract any time after plaintiffs first rejected the financing by offering new mortgage terms and certainly when they subsequently failed to obtain separate financing.

We disagree with plaintiffs' argument that several actions taken by defendant constituted a breach of the contract prior to defendant's termination. First, plaintiffs assert defendant's delegation of the drafting of the mortgage instrument was a breach. The contract did not prohibit the delegation of the

drafting or state who would bear the costs of the service. N.J.S.A. 12A:2-210(1) provides:

> A party may perform his duty through a delegate unless otherwise agreed or unless the other party has a substantial interest in having his original promisor perform or control the acts required by the contract. No delegation of performance relieves the party delegating of any duty to perform or any liability for breach.

Thus, defendant was permitted to delegate the drafting responsibility to a third party so long as a financing option was ultimately provided to plaintiffs, which it was.

Second, there was nothing improper in charging a fee for preparing the loan documents. N.J.S.A. 46:10A-6 provides:

> d. If a loan is made to a person or persons primarily for personal, family or household purposes and is secured by real property located in this State . . . the lender shall not require the borrower to reimburse the lender for, or to pay all or any portion of, any fee or expense charged by the lender's attorney except to the extent of a fee for the review of the loan documents . . . .
>
> . . . .
>
> e. If a loan is secured by real property and is not subject to subsection d. of this section, the lender and borrower may agree that the borrower shall reimburse the lender or pay directly for all or any part of the fees and expenses incurred with respect to the loan transaction, including, but not limited to, the fees and expenses of the lender's attorney.

Finally, whether the inclusion of the escrow charge constituted a breach of contract is immaterial as plaintiffs were free to acquire their own financing. After plaintiffs objected to the escrow charge, defendant advised plaintiffs, since they objected to the term, that defendant would agree to an extension of the closing date for plaintiffs to obtain their own financing. When financing was not obtained, defendant terminated the contract as it was entitled to do under the contract terms. Plaintiffs' agreement to the escrow term after the termination was too late.

The trial judge supported its findings of fact and interpretation of the contractual terms with adequate, substantial, and credible evidence. See Seidman v. Clifton Sav. Bank, S.L.A., 205 N.J. 150, 169 (2011). We discern no reason to disturb the ruling.

Affirmed.

I hereby certify that the foregoing is a true copy of the original on file in my office.

M.C. Harley

Clerk of the Appellate Division

A-2010-23